b

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
ALEXANDRIA DIVISION

MARGARITA R. SEDANO,                    CIVIL DOCKET NO. 1:21-CV-00933
Appellant

VERSUS                                  DISTRICT JUDGE DRELL

KILOLO KIJAKAZI,
Appellee                                MAGISTRATE JUDGE PEREZ-MONTES

---

REPORT AND RECOMMENDATION

Before the Court is an appeal by claimant Margarita R. Sedano ("Sedano") from the denial of her claim for Social Security disability income benefits ("DIB").

Because substantial evidence supports the Commissioner's/ALJ's finding that Sedano was not disabled before her disability insured status ended on December 31, 2018, the final decision of the Commissioner should be AFFIRMED and Sedano's appeal should be DENIED AND DISMISSED WITH PREJUDICE.

I.    Background

      A.    Procedural Background

Sedano filed an application for DIB on January 15, 2019, alleging a disability onset date of December 15, 2017 (ECF No. 12-1 at 189) due to fibromyalgia, neuropathy, depression, and diabetes (ECF No. 12-1 at 224).[1]  That application was denied by the Social Security Administration ("SSA") both initially and on reconsideration.  ECF No. ECF No. 12-1 at 122, 132.

---

[1] Sedano's application was amended a month later to reflect that her last name had changed to "Edwards."  ECF No. 12-1 at 193.

A *de novo* hearing was held before an administrative law judge ("ALJ") on June 5, 2020, at which Sedano (now "Edwards") appeared with her attorney and a vocational expert ("VE").  ECF No. 12-1 at 35.

The ALJ found that Sedano last met the insured status requirements on December 31, 2018, she did not engage in  substantial gainful activity from December 15, 2017 through December 31, 2018, and she has one severe impairment: fibromyalgia.  ECF No. 12-1 at 22.  The ALJ further found that, through the date she was last insured, Sedano had the residual functional capacity to perform medium work except that she would be off-task less than 10 percent of the workday, and that she would be off-task for any reason including the need to take additional breaks, to alternate sitting or standing, or due to the effects of pain and medication.  ECF No. 12-1 at 25.

The ALJ found that Sedano could perform her past relevant work as a consecutive foreign language translator, a housekeeper, an auto parts counter person, a production line welder, and a sorter assembler.  ECF NO. 12-1 at 29.  The ALJ concluded that Sedano was not under a disability, as defined in the Social Security Act, at any time from her alleged onset date, December 15, 2017, through the date she was last insured, December 31, 2018.  ECF No. 12-1 at 29.

Sedano requested a review of the ALJ's decision, but the Appeals Council declined to review it (ECF No. 12-1 at 5) and the ALJ's decision became the final decision of the Commissioner of Social Security ("the Commissioner").

Sedano then filed this appeal for judicial review of the Commissioner's final decision. Sedano contends that, at Step 3 of her analysis, the ALJ failed to evaluate her fibromyalgia pursuant to Social Security Ruling ("SSR") 12-2p.

B.    Medical Records

In January 2011, Dr. Martha M. D'Ilio, Ph.D., was employed by Disability Determination Services of Mississippi to conduct a comprehensive mental status evaluation of Sedano (then Gonzalez). ECF No 12-1 at 383. Gonzalez had been receiving SSI for about one month for depression, and had applied for DIB for depression. ECF No. 12-1 at 383. Dr. D'Ilio noted Sedano's eighth grade education, and employment history as a welder and an auto parts store stock clerk. ECF No. 12-1 at 383-84. Sedano reported taking Wellbutrin, Zoloft, and Remeron, and admitted she had not taken them for a month. ECF No. 12-1 at 384. Sedano reported a history of psychiatric treatment, but no current treatment. ECF No. 12-1 at 385. Dr. D'Ilio concluded that Sedano was able to perform routine, repetitive tasks, interact with coworkers, and received supervision; able to maintain excellent attention and concentration; and could handle her own personal finances. ECF No. 12-1 at 387. However, Sedano's 12 month prognosis was guarded due to a history of non-compliance with outpatient treatment and medication management. ECF No. 12-1 at 387.

In July 2017, Sedano, then 49 years old, went to her primary care provider, Dr. Jonathan Whitehead, for a refill of her anti-depressant medication. ECF No. 12-1 at

410.  Dr. Whitehead noted her depression was chronic and ongoing, but did not limit her activities.  ECF No. 12-1 at 410.  Dr. Whitehead also noted that Sedano never drinks alcohol but smokes half a pack of cigarettes daily.  ECF No. 12-1 at 410.  Sedano was 5 feet tall and weighed 164.5 pounds.  ECF NO. 12-1 at 411.  Her blood pressure was 113/78.  ECF No. 12-1 at 411.  Sedano's diagnoses were fibromyalgia, anxiety disorder, depressive episodes, and a BMI of 32.1.  ECF No. 12-1 at 412.  Sedano was prescribed Celexa and Neurontin, and instructed to diet and exercise.  ECF No. 12-1 at 412.

In October 2018, Sedano was seen for her diabetes Type II, hyperlipidemia, insomnia, fibromyalgia, and depression.  ECF No. 12-1 at 447.  Sedano was already taking metformin, diclofenac, lovastatin, Celexa, and trazodone.  ECF No. 12-1 at 447.  Sedano reported smoking at least about ½ a pack of cigarettes a day.  ECF No. 12-1 at 448.  Her blood pressure was 129/84, and she was 5 feet tall and weighed 163 pounds.  ECF No. 12-13 at 450.  Sedano was prescribed refills for metformin (for diabetes), Lovastatin (for hyperlipidemia), Flexeril (for fibromyalgia), Trazodone (for insomnia), and Celexa (for depressions).  ECF No. 12-1 at 450-51.

In January 2019, Sedano had a follow-up appointment for her diabetes mellitus.  ECF No. 12-1 at 437.  At that appointment, Sedano complained of burning, or numbness and tingling in both legs.  ECF No. 12-1 at 437, 443.

In January 2019, Sedano had a lumbar spine x-ray due to complaints of numbness to both legs and low back pain after a fall two years ago.  ECF No. 12-1 at

436.  The X-ray showed Sedano's lumbar spine was normal, but she has peripheral vascular disease of the abdominal aorta.  ECF No. 12-1 at 436.

In May 2019, Sedano (then Edwards) was evaluated by Dr. Tosheiba Holmes, a family medicine doctor, at the instigation of Louisiana Disability Determination Services.  ECF No. 12-1 at 474.  Dr. Holmes found Sedano was 51 years old, left handed, 5' tall, weighed 158 pounds, and smoked tobacco.  ECF No. 12-1 at 474, 476.  Sedano reported that she could walk up to a mile on level ground, feed herself, and dress herself.  ECF No. 12-1 at 475.  However, Sedano had difficulty standing for 30-60 minutes, lifting more than 10-25 pounds with her left arm, or driving for more than 30-60 minutes at a time. ECF No. 12-1 at 475.  Sedano also could not sweep, mop, vacuum, cook, wash dishes, grocery shop, or mow grass for more than 15-30 minutes at a time.  ECF No. 12-1 at 475.  Sedano claimed that she could not climb one flight of stairs.  ECF No. 12-1 at 475.

Dr. Holmes found seven tender points.  ECF No. 12-1 at 477.  Sedano had negative straight leg rising; normal fine and gross hand motor skills; no evidence of muscular atrophy; equal motor strength; and normal ranges of motion.  ECF No. 12-1 at 477-78.  Dr. Holmes found Holmes has: fibromyalgia not well-controlled; neuropathy secondary to diabetes mellitus; depression (controlled); and diabetes (controlled).  ECF No. 12-1 at 478.  Dr. Holmes concluded that Sedano has the following limitations: stand frequently–1/3 to 2/3 of an eight hour workday; walk

occasionally–up to 1/3 of an eight hour workday; has a limited ability to bend or stoop; has poor balance; and can ambulate without difficulty.  ECF No. 12-1 at 478.

Also in May 2019, Dr. Fay C. Thrasher, Ph.D. gave Sedano a mental status examination at the request of the Louisiana Disability Determination Services.  ECF NO. 12-1 at 484.  Sedano claimed to have been beaten by her older sister (who took care of her) when she was 5 to 15 years old, and also by her first husband.  ECF No. 12-1 at 484.  Sedano claimed to have depression, OCD, anxiety, and bi-polar disorder, as well as racing thoughts.  ECF No. 12-1 at 484.  Sedano reported having been hospitalized in a mental health hospital in 2009 and in 2016 (for two years).  ECF No. 12-1 at 484.  Sedano was currently being treated for depression by her primary care provider.  ECF No. 12-1 at 484.  Sedano said she was compliant with taking Celexa.  ECF No. 12-1 at 484.  Sedano said she was also taking medication for fibromyalgia, diabetes, bulging discs, and neuropathy.  ECF No. 12-1 at 484.

Sedano also reported to Dr. Thrasher that she was capable of bathing, grooming, dressing, shopping, cooking, and doing household chores.  ECF No. 12-1 at 485.  Sedano gets up at 5:00 a.m. and goes to bed at 8:30 p.m.  ECF NO. 12-1 at 485.  Sedano's daily routine consists of checking her blood sugar, doing light chores, and watching TV.  ECF No. 12-1 at 485.  Sedano displayed appropriate behavior, social functioning, and hygiene.  ECF No. 12-1 at 485.  She completed the eighth grade.  ECF NO. 12-1 at 485.  She was Hispanic, married, had four children, and lived with her husband.  ECF No. 12-1 at 485.  Her last job was as a translator for one year.

ECF NO. 12-1 at 485. Sedano retired in July 2017 due to her medical issues. ECF No. 12-1 at 485. Sedano said she can accept instructions and criticism from supervisors and get along with co-workers. ECF No. 12-1 at 485. However, she does not respond appropriately to stress and changes or an ordinary work setting, and cannot set realistic goals or make plans independently. ECF No. 12-1 at 485.

Dr. Thrasher found Sedano suffers from Post-Traumatic Stress Disorder ("PTSD"), bi-polar disorder, major depressive disorder, and obsessive-compulsive disorder (by history). ECF No. 12-1 at 486. Sedano could understand, follow, and moderately retain simple instructions within normal limits. ECF No. 12-1 at 487. Sedano's estimated intellectual ability appeared to be in the average range. ECF No. 12-1 at 487. Sedano's pace was "good," and her concentration and persistence were "fairly good." ECF No. 12-1 at 486. Sedano could perform repetitive skills and a three-stage command. ECF No. 12-1 at 486.

Dr. Thrasher found Sedano would not be able to maintain attention and concentration to perform those tasks for a two-hour work block. ECF Nos. 12-1 at 487. Sedano's ability to relate to coworkers and the general public is limited due to her mental health and medical issues, as well as trust issues. ECF No. 12-1 at 487. Sedano's ability to sustain effort and persist at a normal pace over the course of a routine 40-hour work week, and her ability to tolerate stress, pressure, and the social environment of a work setting were limited due to her symptoms. ECF No. 12-1 at 487. Moreover, Sedano was unable to modulate and express anger in a socially

appropriate manner, and has very limited coping strategies, which precludes her from adapting effectively to even slight changes.  ECF No. 12-1 at 487.  Sedano was, however, independent, able to set goals and initiate action toward them with encouragement, and could manage her personal finances.  ECF NO. 12-1 at 487.

In June 2019, a Psychiatric Review Technique form was filled out by Dr. Deanna Gallavan, Ph.D., after a consultative review of Sedano's medical records.  Dr. Gallavan found that Sedano had only mild limitations in her abilities to: understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manager herself.  ECF No. 12-1 at 98.  Dr. Gallavan concluded that Sedano suffered from non-severe depression, and that her symptoms and their limiting effects only mildly impair her global and work-related functioning. ECF No. 12-1 at 98-99.

After a review of Sedano's medical records in June 2019, Dr. Larry Ressler filled out a Physical Residual Functional Capacity Assessment.  ECF NO. 12-1 at 99-100.  Dr. Ressler found Sedano suffered from pain.  ECF No. 12-1 at 99.  Dr. Ressler also found Sedano could: occasionally lift/carry up to 50 pounds; frequently lift/carry up to 25 pounds; stand/walk up to 6 hours in an 8 hour day; sit up to 6 hours in an 8 hour day; and do unlimited pushing and pulling with her hand and feet.  ECF No. 12-1 at 100.

In October 2019, another Psychiatric Review Technique form was filled out by Dr. Joseph Kahler, Ph.D.,  from a review of Sedano's medical records.  ECF No. 12-1

8

at 115.  Dr. Kahler noted that Sedano had alleged a worsening of her condition and had some new medical records.  ECF No. 12-1 at 115.  Dr. Kahler found Sedano still had no more than mild work-related mental limitations.  ECF No. 12-1 at 115.

An additional Physical Residual Functional Capacity Assessment was made by Dr. Luis Hargus in September 2019.  ECF No. 12-1 at 118-19.  Dr. Hargus found no changes to the initial residual functional capacity assessment by Dr. Ressler.  ECF NO. 12-1 at 119.

In March 2020, cervical spine x-rays were ordered due to Sedano's worsening chronic neck pain.  ECF No. 12-1 at 507.  The x-rays showed normal findings.  ECF No. 12-1 at 507.  X-rays of Sedano's lumbosacral spine were also normal.  ECF No. 12-1 at 510.

In May 2020, a carotid ultrasound (due to complaints of dizziness) was normal.  ECF No. 12-1 at 577.

In June 2020 (post-hearing), Paula Santagati, a Vocational Rehabilitation Counselor specializing in job placement, examined Sedano's records and assessed her "realistic vocational options."  ECF No. 12-1 at 338.  Santagati found that all unaccommodated work was precluded and that even with accommodations, it was unlikely that Sedano would be able to sustain full time competitive employment.  ECF No. 12-1 at 338.  Santagati explained that being off task even less than 10% of the time would have consequences and, if attention and performance are required, would result in disciplinary action and eventual termination.  ECF No. 12-1 at 338.  She

further explained that being off task 15 % of the time would not be tolerated in any job because it would amount to 6 hours in a 40 hour work week.  ECF No. 12-1 at 338.

Santagati also stated that a person who can tolerate few workplace changes and only occasional interactions with co-workers is unemployable because all workplaces have many changes, and the onboarding process for new employees necessarily involves more than occasional interactions with co-workers.  ECF No. 12-1 at 339.  Finally, Santagati pointed out that the POMS DI 25020.010 states ability to adapt to change is among the mental abilities required for any job, while the ability to tolerate and respond appropriately to supervision, coworkers, and usual work situations is a basic work function, under 20 C.F.R. 404.1520a(c)(2).  ECF No. 12-1 at 339.

Also in June 2020, Sedano was treated for neuropathy causing "burning" in her right foot.  ECF No. 1-1 at 568.  Sedano was prescribed atorvastatin (mixed hyperlipidemia), cyclobenzaprine (depression), gabapentin (neuropathy), ibuprofen (sciatica and back pain), Januvia (diabetes), metformin (diabetes), and  trazodone (neuropathy).  ECF No. 12-1 at 568-69.  Sedano was also noted to have a Vitamin D deficiency.  ECF No. 12-1 at 569.

### C.    June 2020 Administrative Hearing

Sedano testified at her administrative hearing that she had remarried since she filed her application, and her last name had changed from Sedano to Edwards.

ECF No. 12-1 at 37. Sedano was 52 years old at the time of her hearing and had an eighth grade education. ECF No. 12-1 at 41.

Sedano lived in a mobile home with her husband. ECF No. 12-1 at 72. Her husband worked full time. ECF No. 12-1 at 73. Sedano's last name changed from Edwards to Sedano when she remarried in December 2018. ECF No. 12-1 at 73.

Sedano testified that she has fibromyalgia pain in her neck, shoulders, back, and legs. ECF No. 12-1 at 44. It is an unbearable burning pain that sometimes prevents her from even being able to stand up. ECF No. 44. She has shoulder pain when tries to hold her arms up to do things like brush her hair. ECF No. 12-1 at 46. The pain started when Sedano was in her early 20's, and worsened as she got older. ECF No. 12-1 at 45. The pain puts Sedano in a bad mood. ECF No. 12-1 at 45. Sedano's fibromyalgia medication gives her dry mouth and nausea. ECF No. 12-1 at 44. Sedano further testified that she takes so much medication, she feels drunk and sleepy all the time. ECF No. 12-1 at 45. The medication helps her pain on some days, but the days it does not help, her doctor told her to try taking 2 or 3 pain pills instead of just one. ECF No. 12-1 at 46. That way, the doctor could determine whether she should increase Sedano's dosage. ECF No. 12-1 at 46.

Sedano testified that her neck, shoulders, and upper back always "burn," and that is how every day starts. ECF No. 12-1 at 47. As the day progresses, the pain moves down into her legs. No. 12-1 at 47. The more she moves around during the day, the worse her pain gets until she cries and has to lay down. ECF No. 12-1 at 47.

11

Sedano testified that happens nearly every day.  ECF No. 12-1 at 47.  She has one or two good days per week, when she can get up and do something before the pain starts getting bad.  ECF No. 12-1 at 47.

Bending her neck to do things like wash dishes causes Sedano's neck and shoulders to start hurting after about ten minutes.  ECF No. 12-1 at 48-49.  Also, sitting slumped over makes her neck hurt, and she has to lay down with her upper body on an incline.  ECF No. 12-1 at 48.  Laying down usually eases the pain.  ECF No. 12-1 at 49.  If the pain does not ease, Sedano just sits down and goes to sleep.  ECF No. 12-1 at 49.  Sedano does not think anyone will fire her if she has to sit and rest to five, 10, or 20 minutes at a time.  ECF No. 12-1 at 50.  She cannot concentrate on doing a job when she is in pain.  ECF No. 12-1 at 50.  Sedano takes medicine for the fibromyalgia pain three times per day but it does not help.  ECF No. 12-1 at 50.  Sedano's doctor made her an appointment with a specialist for her fibromyalgia.  ECF No. 12-1 at 51.

Sedano's doctor also made her an appointment with a specialist for her diabetes.  ECF No. 12-1 at 53.  Sedano's feet burn from hot spots due to neuropathy caused by her diabetes.  ECF No. 12-1 at 52.  She said her doctor does not understand why she is getting hot spots when her diabetes is not extreme.  ECF No. 12-1 at 52.  She cannot walk when she has hot spots on her feet.  ECF No. 12-1 at 53.  Sedano described it as a burning pain in different spots on her feet.  ECF No. 12-1 at 53.  She has had hot spots, on and off, for about a year.  ECF No. 12-1 at 53.  The hot spots

are currently constant.  ECF No. 12-1 at 53.  If Sedano props her feet up, the pain eases, but returns as soon as she puts pressure on her feet again.  ECF No. 12-1 at 54.  Sedano's doctor has increased her neuropathy medication.  ECF No. 12-1 at 54-55.

Sedano also has pain that starts in her left temple, goes down to her left ear, and then travels up through her jaw and nose.  ECF No. 12-1 at 55.  It becomes severe ear pain that causes her to lose her balance, become light-headed, and be unable to drive.  ECF No. 12-1 at 55.  That pain occurs about three times per week, and lasts one to two days.  ECF No. 12-1 at 56.  Sedano had an appointment to see an ear, nose, and throat specialist for that pain.  ECF No. 12-1 at 56-57.

Sedano testified that she suffers from depression, also, but cannot afford to treat it.  ECF No. 12-1 at 57.  However, her fibromyalgia medication is also an antidepressant, and her sleeping pill also helps her depression.  ECF No. 12-1 at 57.  Sedano has good days and bad days.  ECF No. 12-1 at 58.  Sometimes she wakes up depressed, and other times her depression is triggered by rain or studying all day.  ECF No. 12-1 at 58.  Depression causes Sedano to cry and to lash out at people.  ECF No. 12-1 at 58.  Three or four days per week, Sedano cannot make herself get out of bed and get dressed.  ECF No. 12-1 at 58, 62.  Sedano may not be able to get out of bed all week if it rains all week, or during the winter.  ECF No. 12-1 at 58-59.

Sedano testified that she has to eat to control her blood sugar, but her medications cause her to gain weight, and she cannot exercise because she does not have the energy and due to her fibromyalgia.  ECF No. 12-1 at 59.

Sedano has insomnia that causes her to wake up off and on every night.  ECF No. 12-1 at 59.  Some nights, she does not sleep at all, but instead lays in a recliner and watches TV.  ECF No. 12-1 at 59.

Sedano's concentration is so poor that she cannot remember what she reads.  ECF No. 12-1 at 60.  She also cannot remember verbal instructions.  ECF No. 12-1 at 60.  She can drive to the grocery store or to the doctor, but she does not drive much.  ECF No. 12-1 at 61.  Sedano's vision is blurry and she is scared to drive over overpasses and bridges.  ECF No. 12-1 at 61.

Sedano testified that some days she is too depressed to get out of bed, or that her feet hurt when she gets out of bed.  ECF No. 12-1 at 62.  If she gets up, she briefly combs through her hair.  ECF No. 12-1 at 62.  When her husband is gone (he drives a truck), she eats sandwiches, cereal, TV dinners, tuna, or scrambled eggs.  ECF No. 12-1 at 62.  When her husband is there, he cooks.  ECF No. 12-1 at 62.  Sedano cleans her house, usually a little each day, and washes her clothes, but is unable to iron her clothes.  ECF No. 12-1 at 63.  Sedano cannot attend church due to pain, and because she is unable to wear dress shoes, so she watches a church service on TV.  ECF No. 12-1 at 63-64.  She does not visit friends, and cannot go out to eat, due to pain.  ECF No. 12-1 at 64.

14

Sedano testified that she used to be able to play baseball and football with her children when they were growing up, and she took them to church. ECF No. 12-1 at 65. Now, she is unable to do anything with her grandchildren. ECF No. 12-1 at 65.

In 2005 through 2007, Sedano worked full time at an auto parts store as a cashier and delivery person. ECF No. 12-1 at 66, 73. Sedano did not lift more than 25 pounds. ECF No. 12-1 at 66. She also worked full time at a furniture factory as a trolley driver for about six months. ECF No. 12-1 at 73. The heaviest weight she lifted there was three or four pounds. ECF No. 12-1 at 74. She sat most of the time, to drive the trolley. ECF No. 12-1 at 74.

Sedano also worked for Howard Industries, on computer motherboards for the hospital. It was a full-time sit-down job in air-conditioning, for which Sedano used a soldering iron and did not lift more than about five pounds. ECF No. 12-1 at 67, 74. Sedano stood and walked a total of about one hour in an eight-hour day. ECF No. 12-1 at 74. She worked there for one and a half to two years. ECF No. 12-1 at 74.

Sedano next worked as a welder, first moving panels through the line for the welders, then later doing welding. ECF No. 12-1 at 67-68. Sedano took a six-week on-the-job training course for welding. ECF No. 12-1 at 68. She had to stand all day, and lifted up to 30 or 40 pounds. ECF No. 12-1 at 68, 75.

After that job, Sedano worked for about one month at another auto supply store, then for about a year at a second auto supply store, both times as a cashier,

lifting up to 20 to 25 pounds.  ECF No. 12-1 at 75-76.  When she worked at the auto parts stores, Sedano also had to look up part numbers.  ECF No. 12-1 at 78.

Sedano worked full time at two different places as a hotel housekeeper, standing and walking all day, and lifting up to three to five pounds (a set of sheets) at a time.  ECF No. 12-1 at 68, 76.  She worked about a year at the first hotel, and five months at the second hotel.  ECF NO. 12-1 at 76-77.

Sedano's last job was as a self-employed translator, assisting at asylum hearings, for one-and-a-half years.  ECF No. 12-1 at 69, 77.  Sedano testified that she would drive the asylum-seeker to the hearing in New Orleans and translate for them. ECF No. 12-1 at 69.

She stopped doing that when she fell down a flight of steps at a hotel and hurt her back.  ECF No. 12-1 at 69, 77.  Sedano was unable to drive for six months due to sciatic pain in her back.  ECF No. 12-1 at 69.  Sedano was unable to afford an MRI. ECF No. 12-1 at 69.  By the time Sedano's back was healed enough for her to return to New Orleans, she was no longer accepted as a translator because she was not licensed and she only had an eighth grade education.  ECF No. 12-1 at 70.

Sedano testified that her medication caused her to have difficulty controlling her bowel movements, so she does not like to leave home.  ECF No. 12-1 at 70. Metformin, which she takes for diabetes, causes diarrhea.  ECF No. 12-1 at 71. Sedano wears an adult diaper if she goes in public.  ECF NO. 12-1 at 71.

The VE testified that Sedano's work as a "consecutive foreign language translator," DOT 137.267-010, was sedentary work with an SVP of 6. ECF No. 12-1 at 79. Sedano's work as a housekeeper was DOT 323.687-014, light work, with an SVP of 2. ECF No. 12-1 at 79. Her work as an auto parts counter person was DOT 279.357-062 was light work with an SVP of 5. ECF No. 12-1 at 79. Her work as a production line welder was DOT 819,84-010 was medium work with an SVP of 2. ECF No. 12-1 at 79. Her work as a solder assembler was DOT 813.684-022, light work, with an SVP of 2. ECF No. 12-1 at 79.

The VE further testified that Sedano performed all of her work at the same level as the DOT exertional levels. ECF No. 12-1 at 79. Sedano has skills that would transfer to sedentary work–basic math skills to total costs, make change, and compute percentages; keeping records of sales; contact customers; demonstrating and selling products; and talking easily and persuasively to people. ECF No. 12-1 at 81. Those skills were acquired from her work as an auto parts counter person. ECF No. 12-1 at 81.

The ALJ posed a hypothetical to the VE involving an individual with the same past work as Sedano, who is limited to medium work, and would be off task less than ten percent of the workday (for any reason, including additional breaks, medication side effects, alternating sitting and standing, or symptoms of severe impairment). ECF No. 12-1 at 79. The VE testified that such a person could perform her past relevant work. ECF No. 12-1 at 80.

The ALJ posed a second hypothetical involving an individual as described in the first hypothetical but with the additional imitation of unskilled work involving only simple routine tasks involving nor more than simple short instructions and simple work-related decisions with few workplace changes and no more than occasional interaction with coworkers and the general public.  ECF No. 12-1 at 80. The VE testified that such a person would still be able to work as a housekeeper, a production line welder, or a solder assembler.  ECF No. 12-1 at 80.  Additionally, such a person could work as: a kitchen helper (DOT 318-687-010, medium work, SVP 2, 145,000 jobs existing in the national economy); a cook helper (EOT 317.687-010, medium work, SVP 2, 28,000 jobs in the national economy); or a motor vehicle assembler (DOT 806.684-010, medium work, SVP 2, 240,000 jobs in the national economy).  ECF No. 12-1 at 80.

The VE testified that the person could also do sedentary level work as: (1) a telephone solicitor (DOT 299.357-014, sedentary work, SVP 3) (86,700 jobs in the national economy); (2) tube room cashier (DOT 211.482-010, sedentary work, SVP 3) (47,500 jobs in the national economy); or (3) order taker (DOT 249-362-126, sedentary work, SVP 4) (105,000 jobs in the national economy).  ECF No. 12-1 at 82.

The ALJ posed a third hypothetical with the additional limitation–added to either the first or second hypotheticals–that the individual would be off-task 15 percent of the workday (for the reasons described in the first hypothetical).  ECF No.

12-1 at 80.  The VE testified that such an individual would not be able to maintain any employment in the national economy.  ECF No. 21-1 at 81.

The VE explained that his primary job information source was skillTRAN Job Browser Pro software.  ECF No. 12-1 at 82.  None of the jobs cited included part time work.  ECF No. 12-1 at 83.  The VE further testified that a person who is unable to maintain attention and concentration for less than two hours and  requires redirection would not be able to maintain employment.  ECF No. 12-1 at 83.  The VE also explained there are light level jobs that an individual can do while sitting most of the day, but they would still have to exert greater than 10 pounds of force or lift things that weight more than 10 pounds, such as: (1) labeler (DOT 920.687-126, light work, SVP 2) (6200 jobs in the national economy); (2) routing clerk (DOT 222.587-038, light work, SVP 2) (35,000 jobs in the national economy); and (3) .  ECF No. 12-1 at 84.  Routing clerk, or mail sorter (DOT 222.687-022, light work, SVP 2) (97,000 jobs in the national economy).  ECF No. 12-1 at 84-86.  Those jobs would also allow a sit-stand option if the person needed to stand up every 30 minutes.  ECF No. 12-1 at 86.  Finally, the VE testified that, if the person was unable to show up for work at least one day a week due to mental health issues, that person would not be able to maintain employment.  ECF No. 12-1 at 87.

### D.  ALJ's Findings

To determine disability, the ALJ applied the sequential process outlined in 20 C.F.R. §404.1520(a) and 20 C.F.R. §416.920(a).  The sequential process required the

ALJ to determine whether Sedano (1) is presently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("Appendix 1"); (4) is unable to do the kind of work she did in the past; and (5) can perform any other type of work. If it is determined at any step of that process that a claimant is or is not disabled, the sequential process ends. A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis. *See Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), cert. den., 514 U.S. 1120 (1995) (citing *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987)).

To be entitled to benefits, an applicant bears the initial burden of showing that she is disabled. Under the regulations, this means that the claimant bears the burden of proof on the first four steps of the sequential analysis. Once this initial burden is satisfied, the Commissioner bears the burden of establishing that the claimant is capable of performing work in the national economy. *See Greenspan*, 38 F.3d at 237.

In the case at bar, the ALJ found that Sedano has not engaged in substantial gainful activity since her alleged onset date of December 15, 2017, that her disability insured status expired after December 31, 2018, and that she has a severe impairment of fibromyalgia. ECF No. 12-1 at 22. The ALJ also found that Sedano does not have an impairment or combination of impairments listed in or medically equal to one listed in Appendix 1. ECF No. 12-1 at 24.

The ALJ then found that, as of December 31, 2018, the date she last had disability insurance, Sedano had the residual functional capacity to do medium work except that she would be off task less than 10 percent of the workday (including the need to any additional breaks, alternating sitting or standing, or due to the effect of pain and medication). ECF No. 12-1 at 25. The ALJ found that Sedano was still able to perform her past relevant work as a consecutive foreign language translator, a housekeeper, and auto parts counter person, a production line welder, and a sorter assembler. ECF No. 12-1 at 28. The sequential analysis thus ended at Step 4, with a finding that Sedano was not disabled at any time from December 15, 2017 (her alleged onset date) through December 31, 2018 (the date last insured). ECF No. 12-1 at 29.

## II.    Law and Analysis

### A.    The ALJ's errors at step 3 were harmless.

Sedano contends on appeal that, at step 3 of his analysis, the ALJ failed to properly evaluate her fibromyalgia pursuant to SSR 12-2p. Specifically, Sedano contends that, although the ALJ found her fibromyalgia did not meet or equal a listing, the ALJ failed to state which listings she did not equal and why.

At step 3 of the disability analysis, an ALJ determines whether the claimant has an impairment that "meets or equals" one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. 20 C.F.R. § 404.1520(a)(4)(iii). The Listing of Impairments in Appendix 1 "describes for each of the major body systems

impairments that we consider to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. § 404.1525 (a). If the claimant has an impairment that meets or equals one of the listings in Appendix 1 and meets the duration requirement, the ALJ will find the claimant disabled. *Id.* If, however, the claimant has an impairment that is not described in Appendix 1, the ALJ "will compare [the claimant's] findings with those for closely analogous listed impairments." If those findings are "at least of equal medical significance to those of a listed impairment," the ALJ will find that the impairment is medically equivalent to the analogous listing. 20 C.F.R. § 404.1526(b)(2).

In *Audler v. Astrue,* 501 F.3d 446, 448 (5th Cir. 2007), the Fifth Circuit found that an ALJ's failure to identify the listing for which the claimant's symptoms failed to qualify or to provide any explanation as to how she made that determination constituted error as such a bare conclusion is beyond meaningful judicial review. "Although an ALJ is not always required to do an exhaustive point-by-point discussion of the evidence, his or her decision must be susceptible of thoughtful court scrutiny." *Smith v. Astrue,* 914 F. Supp. 2d 764, 784 (E.D. La. 2012) (*quoting Audler,* 501 F.3d at 448).

"However, even where a step three violation has occurred, such must be subjected to a harmless error analysis to determine whether the substantial rights of a party have been affected." *Id.* "That showing typically requires a claimant to

demonstrate that her impairment satisfies the criteria of a particular listing." *Id.; see also Dise v. Colvin*, 630 Fed. Appx. 322, 324-25 (5th Cir. 2015) (any error by the ALJ in failing to specifically discuss a potentially applicable listing was harmless); *Bullock v. Astrue*, 277 Fed. Appx. 325, 327-28 (5th Cir. 2007) ("Thus, the sole question ... is whether substantial evidence supports the ALJ's finding . . . .").

There is no listing in Appendix 1 for fibromyalgia. However, in 2012, the SSA issued Social Security Ruling 12-2p to clarify that fibromyalgia "can be a basis for a finding of a disability," and to provide guidance on how an ALJ determines whether a claimant has a medically determinable impairment of fibromyalgia. SSR 12-2p, 2012 WL 3104869, at *2.

Under 29 C.F.R. § 404.1526(b)(2), if a claimant has fibromyalgia, the ALJ must compare the claimant's findings with those for closely analogous listed impairments. *See McCurry*, 2022 WL 3135753, at *3; *see also* SSR 12-2p, 2012 WL 3104869, at *6. SSR 12-2p states that, because fibromyalgia is not a listed impairment, the ALJ must determine at step three "whether [fibromyalgia] medically equals a listing (for example, listing 14.09D in the listing for inflammatory arthritis), or whether it medically equals a listing in combination with at least one other medically determinable impairment."[2] SSR 12-2p, 2012 WL 3104869, at *6; *see also McCurry*, 2022 WL 3135753, at *3.

---

[2] Social Security Rulings are "binding on all components of the Social Security Administration." 20 C.F.R. § 402.35(b)(1).

Fibromyalgia "is a complex medical condition characterized primarily by widespread pain in the joints, muscles, tendons, or nearby soft tissues that has persisted for at least 3 months." *McCurry v. Kijakazi*, 2022 WL 3135753, at *3 (W.D. Tex. 2022), *report and recommendation adopted*, 2022 WL 17732696 (W.D. Tex. 2022) (*citing Patrick v. Commissioner of Social Security Administration*, 2022 WL 2813751, at *3 (S.D. Miss. 2022), *report and recommendation adopted*, 2022 WL 2813047 (S.D. Miss. 2022). Fibromyalgia can provide the basis for a finding of disability when medical evidence establishes that the claimant has (1) a history of widespread pain in the back and all four quadrants of the body; (2) evidence, such as lab tests, that could rule out other disorders which could account for the claimant's symptoms and signs; and (3) either (a) at least 11 of 18 tender-point sites on physical examination, or (b) repeated manifestations of six or more symptoms or co-occurring conditions, especially fatigue, cognitive or memory problems, waking unrefreshed, depression, anxiety disorder, or irritable bowel syndrome. *See* SSR 12-2p, 2012 WL 3104869, at *3 (2012).

At Step 3, the ALJ found (ECF No. 12-2 at 24):

The undersigned notes that the listings do not specifically address fibromyalgia. However, adjudicators assess that condition as a medically determinable impairment under SSR 12-2p. The ruling requires the record show a history of widespread pain. In addition, the ruling requires repeated manifestations of six or more fibromyalgia symptoms, signs, or co-occurring conditions, especially manifestations of fatigue, cognitive or memory problems ("fibro fog"), waking unrefreshed, depression, anxiety disorder, or irritable bowel syndrome. Finally, the ruling requires evidence that other disorders that could cause these

24

repeated manifestations of symptoms, signs, or co-occurring conditions were excluded. The overall record included evidence of these requirements, as discussed in more detail below.

The ALJ's discussion of the medical records included (ECF No. 12-1 at 26):

> The treatment records prior to the December 2018 date last insured showed the claimant reported physical symptoms including malaise (Ex. B4F/3) and a history of fibromyalgia (Ex. B5F/16), with left side body pain (Ex. B11F/3), generalized body pain (Ex. B11F/5), and injection treatments (Ex. B11F/3). Additional records noted the claimant reported tenderness (Ex. B13F/15). However, the records also noted the claimant denied fatigue (Ex. B4F/3), denied stiffness, denied swelling, denied back pain, denied muscle weakness, denied myalgias (Ex. B4F/4), and denied gait abnormality (Ex. B4F/13). Additional records showed the claimant reported she did not limit her activities (Ex. B14F/5, 15). The records indicated the claimant reported that she had been moving boxes all week prior to a treatment visit (Ex. B11F/3), and that the claimant reported improvement on medication (Ex. B13F/16, 18).
>
> On examination, the limited medical record[s] prior to the December 2018 date last insured indicated physical signs and findings, including tenderness (Ex. B11F/3). However, other exam records indicated no acute distress, normal musculoskeletal range of motion, normal strength, no swelling, and no tenderness (Ex. B3F/5), with normal gait and station (Ex. B4F/5), independent ambulation (Ex. B13F/13), and normal neck range of motion with no tenderness (Ex. B13F/18).
>
> The undersigned notes that the overall examination records consistently indicated relatively unremarkable mental health signs and findings, including full orientation, normal recall, normal mood and affect, good eye contact, normal cognitive function, and normal thought content (see Ex. B3F/5; B4F/5; B5F/21; B6F/9; B13F/19; B14F/6).

The ALJ further noted that medical consultants Dr. Ressler and Dr. Hargus found

Sedano was able to perform medium level work despite her fibromyalgia.[3] ECF No.

---

[3] Dr. Holmes evaluated Sedano in person in May 2019. Dr. Holmes did not make any findings as to Sedano's ability to lift or carry, but found she could stand for up to 2/3 of an eight hour workday and walk for up to 1/3 of an eight hour workday. ECF No. 12-1 at 478.

12-1 at 27.  Dr. Thrasher, Dr. Gallavan, and Dr. Kahler also did not find that Sedano had any marked limitations in mental functioning.

Sedano cites only Listing 14.09(D) as one she may equal because it is the most equivalent to fibromyalgia, as stated in SSR 12-2p.  However, Sedano does not show how her symptoms equal Listing 14.09(D).  Listing 14.09(D) requires a "marked level" limitation in one of: activities of daily living; maintaining social functioning; or completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace.  Although Sedano testified to a "marked limitation" in her ability to complete tasks in a timely manner due to deficiencies in concentration, persistence, and pace, none of the evaluating psychiatrists found a marked limitation.  A claimant has the burden of proving that her condition meets or equals an impairment listed in Appendix 1.  *See Selders v. Sullivan*, 914 F. 2d 614, 619 (5th Cir. 1990) (*citing Sullivan v. Zebley*, 493 U.S. 521, 531(1990)).

Sedano also complains the ALJ did not consider Dr. Thrasher's May 2019 evaluation.  It is not clear why the ALJ did not discuss Dr. Thrasher's report.  Although the ALJ stated that she had not considered any medical records "prepared" after December 31, 2018 (or in 2011), Dr. Ressler's, Dr. Hargus's, and Dr. Gallavan's evaluations were conducted in 2019, as was Dr. Thrasher's.  Dr. Ressler Dr. Hargus, and Dr. Gallavan all made their findings from a review of Sedano's medical records, which included the medical records from 2011 and from 2019, while Dr. Thrasher

evaluated Sedano in person in May 2019.  However, Dr. Thrasher's findings do not assist Sedano in equaling a listing.

"Retrospective medical diagnoses constitute relevant evidence of pre-expiration disability, and properly corroborated retrospective medical diagnoses can be used to establish disability onset dates." *Likes v. Callahan*, 112 F.3d 189, 191 (5th Cir. 1997); *see also McLendon v. Barnhart,* 184 Fed. Appx. 430, at *1 (5th Cir. 2006) ("precise contemporaneous medical records are not always a prerequisite to establishment of a disability onset date," citing *Ivy v. Sullivan,* 898 F.2d 1045, 1049 (5th Cir. 1990)); *Orphey v. Massanari*, 268 F.3d 1063, at *2 (5th Cir. 2001)). Additionally, retrospective medical diagnoses may be corroborated with lay testimony. *See id.*

Dr. [Ph.D.] Kahler's analysis in October 2019, from a review of all of Sedano's medical records, properly summarized Sedano's mental health evidence: "the medical evidence from treatment provides supports the establishment of [medically determinable impairment] in the noted area at or prior to [date last insured].  The symptoms described could reasonably result from the [medically determinable impairments] but the [medical evidence of record] only partially supports the claimant's statements regarding the severity of symptoms and their limiting effects. The preponderance of the evidence indicates no more than mild impairment in global and work-related functioning.  Non-severe."  ECF No. 12-1 at 116.

The ALJ also incorrectly refused to consider lay testimony as to Sedano's condition, finding Sedano's husband was biased and not a medical expert. As stated above, lay testimony is considered in establishing a disability onset date. Moreover, pursuant to SSR 12-2p(B)(2), 2012 WL 3104869 at *4, lay testimony, such as that from relatives, helps the SSA assess a claimant's ability to function day-to-day and over time, and in making findings about the credibility of a claimant's allegations about symptoms and their effects. *See also* 20 C.F.R. § 404.1513(a)(4) (categories of evidence–evidence from nonmedical sources). Sedano's husband described a wider range of activities for Sedano then she admitted in her testimony, but he supported her claims of pain in her feet, difficulty raising her arms, and difficulty sleeping. ECF No. 12-1 at 240-47.

Therefore, the ALJ's error in not considering some of the medical evidence from 2019 and the lay evidence was harmless because that evidence does not show that Sedano's fibromyalgia equals Listing 10.9(D).

In summary, the ALJ considered SSR 12-2p. Although the ALJ erred in failing to discuss, at step 3, why Sedano's fibromyalgia was not equivalent to any of the listings, and erred in failing to consider some of the evidence of record, those errors were harmless. Sedano has not carried her burden of showing that her fibromyalgia symptoms equaled a listed impairment from December 15, 2017 through December 31, 2018.

### B.    <u>The ALJ properly evaluated Sedano's pain and found it non-disabling.</u>

Finally, Sedano contends the ALJ inappropriately based her evaluation of Sedano's pain on objective medical evidence.   The evaluation of a claimant's subjective symptoms, such as pain, is a task particularly within the province of the ALJ who has had an opportunity to observe whether the person seems to be disabled. *See Elzy v. Railroad Retirement Bd.*, 782 F.2d 1223, 1225 (5th Cir. 1986); *Loya v. Heckler*, 707 F.2d 211, 215 (5th Cir. 1983).   The ALJ's decision on the severity of pain is entitled to considerable judicial deference.   *See James v. Bowen*, 793 F.2d 702, 706 (5th Cir. 1986); *Jones v. Bowen*, 829 F.2d 524, 527 (5th Cir. 1987).   Hence, the law requires the ALJ to make affirmative findings regarding a claimant's subjective complaints and to articulate the reasons for rejecting any subjective complaints.   *See Falco v. Shalala*, 27 F.3d 162, 163-64 (5th Cir. 1994).

The ALJ made the following findings as to Sedano's pain and credibility (ECF No. 12-1 at 28):

> [T]he claimant rarely sought or received treatment, and the treatment received was relatively conservative. In addition, the claimant takes medication for the alleged impairments, which weighs in the claimant's favor, but the limited medical record reveals that when compliant, the medications have been relatively effective in controlling the claimant's symptoms. Further, the medical evidence of record consistently indicated relatively normal to mild examination findings.

> In addition, the claimant has made inconsistent statements regarding matters relevant to this application. For instance, the claimant reported inconsistently regarding whether she took medication for her conditions, as discussed above (Ex. B3E; B8E; B9E; B11E; B17E).   Hence, the

inconsistencies suggest that the information provided by the claimant generally may not be entirely accurate.

It is clear the ALJ's findings as to Sedano's pain did not rely entirely on objective medical evidence. Since the ALJ in this case has made the mandatory indication of the basis for her credibility choices concerning claimant's complaints, and since her choices are not unreasonable, and are supported by the medical experts, the ALJ's finding that Sedano's pain from fibromyalgia would not prevent her from performing work is proper. *See Carry v. Heckler*, 750 F.2d 479, 485-86 (5th Cir. 1985).

Accordingly, substantial evidence supports the Commissioner's conclusion that Sedano was not disabled by fibromyalgia from December 15, 2017 through December 31, 2018.

## III.   Conclusion

Based on the foregoing, IT IS RECOMMENDED that the final decision of the Commissioner be AFFIRMED and that Sedano's appeal be DENIED AND DISMISSED WITH PREJUDICE.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed. R. Civ. P. 72(b), parties aggrieved by this Report and Recommendation have fourteen (14) calendar days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. No other briefs (such

as supplemental objections, reply briefs, etc.) may be filed.  Providing a courtesy copy of the objection to the undersigned is neither required nor encouraged. Timely objections will be considered by the District Judge before a final ruling.

Failure to file written objections to the proposed findings, conclusions, and recommendations contained in this Report and Recommendation within fourteen (14) days from the date of its service, or within the time frame authorized by Fed. R. Civ. P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Judge, except upon grounds of plain error.

THUS DONE AND SIGNED in chambers in Alexandria, Louisiana, this _____7th_____ day of June 2023.

Joseph H.L. Perez-Montes
United States Magistrate Judge